### A03A2351. MILLER v. THE STATE.
(597 SE2d 475)

SMITH, Chief Judge.

Roderick Deanthony Miller was convicted by a jury of two counts of aggravated assault. Following the denial of his motion for new trial, he appeals. All of his arguments are related to his contention that two witnesses identified him during an impermissibly suggestive showup. We do not agree with Miller that the trial court erred in admitting the identification testimony, and we affirm.

Construed in favor of the verdict, the evidence shows that on the night of May 24, 2000, the victim left his apartment in order to remove the face from his car stereo. While inside his car, the victim noticed a man approaching, carrying a newspaper or magazine. The man was tall, black, and wearing a black stocking cap with braids or dreadlocks "poking out the stocking cap." As the victim was exiting his car, the man dropped the papers he was holding, "put a pistol on" the victim, and told the victim to "give it up." The victim ran away, and he heard the man pull the trigger on the gun. After the victim crossed the street, he looked back and saw the man "going back the opposite way." The victim testified that he had a "pretty good" opportunity to view the man.

The victim's girlfriend watched the encounter from a window in their apartment. She saw a man carrying a newspaper walking toward the victim. She testified that the man stopped walking as the victim exited the car, "and next thing I know he pulled out the gun and point it towards him." The girlfriend saw the victim run away, with the man following behind him, and she called the police. She described the suspect as being a tall, light-skinned black man, wearing dark clothes, with "some type of net thing around his hair, either some braids up under it . . . that was tied around his head." While the suspect was walking toward the victim, the girlfriend "really didn't get a good look at him," but when the suspect stood near the victim, the witness "definitely" got "a better idea for how he looked." She testified that she observed the man for a total of "five or ten minutes."

Police officers arrived at the scene within ten minutes of the girlfriend's emergency call. Cobb County Police Officer William Hudson testified that he arrived at the scene within two minutes of receiving a dispatch concerning the incident. Officer Ralph Escamillo served as backup and arrived at the same time. The officers heard

noise from a nearby wooded area, which sounded "like someone was running through the woods." Hudson testified that he heard "branches breaking" and "leaves rustling." Escamillo returned to the apartment complex to speak with witnesses, and Hudson ran through the woods, following the noise. The victim described the suspect to Escamillo as being a "black male, approximately five foot ten to six feet tall, light skinned, and . . . he described a hair style of either dreadlocks or a cornrow-type hairstyle." The victim "also gave a clothing description of dark-colored shirt, dark-colored pants, and silver and black-colored semiautomatic handgun." Escamillo testified that he gave this description over the radio to Hudson.

While Hudson was running through the woods, he received the description of the suspect. He understood that the man was "approximately five-ten to five-eleven, a black male, dark skin with . . . some type of dreadlocks or cornrolls in his hair." He also understood from the description that the man was wearing a black shirt and blue pants. Hudson ran out of the woods, onto a hotel property, where he described the suspect to a security guard. The guard told him that he had seen a man running from the woods, that the man was sweaty and had twigs in his hair, and that he believed the man was going to a nearby Waffle House.

The guard testified that at approximately midnight, a man came to the locked front door of the hotel and told the guard that his car was broken down and that he needed the telephone. The man had braided hair, had a leaf in his hair, and was "kind of out of breath like he had been running." He stated that the man seemed nervous and that he told him to go use the pay telephone at the Waffle House. The guard testified that he went outside to make rounds and encountered a police officer, who described the suspect. He told the officer that he had given him directions to the Waffle House.

Hudson went to the Waffle House, where he saw a man inside who had twigs and leaves in his hair and who was "sweating profusely." There appears to be no dispute that the suspect in the Waffle House was Miller, but he was wearing clothing that did not fit the description previously given to Hudson. While running through the woods in pursuit of the suspect, however, Hudson had found a pile of clothes, including a black shirt and blue pants. A black stocking was later discovered "crammed inside of the pockets of the pants."

Hudson received backup assistance from another officer, and they decided to conduct a showup identification procedure. The victim and the girlfriend were transported in separate cars to the Waffle House, where they both identified Miller as the man who pointed a gun at the victim. Miller was arrested, and although Officer Escamillo did not talk with Miller or ask him any questions, en route

to the police station, Miller stated, "I should have done that m----- when I had the chance." Miller also asked Escamillo, "How can you charge me with a crime if you don't have a gun or you don't have any money?" and stated, "Yeah, I did it, but you're not going to be able to prove it because you don't have a gun and you don't have any money."

1. Miller contends that the showup was impermissibly suggestive and therefore that the witness's identification testimony should have been excluded at trial.

Miller filed a motion in limine to suppress identification testimony on the ground that the showup procedure was improper. During the hearing on the motion, Escamillo testified that he received a description of the suspect from the victim and radioed the description to the other officers. According to Escamillo, the victim told him that he and the suspect "were within speaking distance," or about five to ten feet from one another, and that the incident occurred about twenty to twenty-five feet from his apartment. He described the lighting at the apartment complex, stating that some "tall light posts . . . go up about 20/25 feet. There's also lighting from the apartments. The apartments have their own lights outside by the front doors. And there's also some street lights at the entrance of the complex." The witnesses told Escamillo that the incident occurred at a group of mailboxes, and Escamillo testified that at this location "there is lighting directly over the mailboxes as well as light posts." Approximately eight to ten minutes after he arrived at the scene, Escamillo received a call from Hudson that he had located a suspect at the Waffle House fitting the description of the suspect. Escamillo went to the Waffle House, where he observed Miller. Although the clothes Miller was wearing did not match the description of the clothes Escamillo had received from the victim, other physical characteristics made Escamillo suspicious of him. Escamillo observed "leaves and dirt plainly visible in his hair, he was sweating profusely, and he was kind of breathing hard. . . . It looked like he was nervous."

Escamillo returned to the apartment complex and had a short conversation outside the presence of the witnesses with the detective on the scene about his belief that a showup identification would be helpful. He did not want the witnesses to overhear the conversation because he "didn't want to put any kind of prejudice ideas in their mind about this possibly being the subject." The officers and detective decided to conduct the showup, and Escamillo advised the witnesses that "if they didn't think it was this person . . . then not to accuse this person of doing something. We were only looking for the person who did the crime and that they had to be certain that this was the individual." The victim and the girlfriend were driven in separate patrol cars from the complex to the Waffle House. Escamillo testified that the Waffle House was "directly right behind the complex. . . .

[T]he Waffle House parking lot is only about 40 feet . . . from the front entrance." He stated that the victim and the girlfriend were placed on the rear passenger sides of the separate patrol cars in which they were riding and that the patrol cars were positioned so that the witnesses could simply "look out the passenger window to view the subject." He testified that there was "ample lighting" in the Waffle House parking lot.

When they arrived for the showup, Miller was standing approximately ten feet from the patrol cars. Escamillo told the victim to stay seated, "not to say anything, and to take his time while looking at the subject." The victim told Escamillo, "[t]hat's definitely him." Escamillo asked the victim if he was sure of the identification, and the victim responded in the affirmative. Escamillo testified that less than 45 minutes elapsed between the time he first arrived at the apartment complex and the time the victim identified Miller.

At trial, Escamillo similarly testified that before he took the victim to the Waffle House, he told the victim that he

> was going to take him over to the Waffle House to see somebody who had been in the area at the time that the incident had occurred, and that it was very important that he understand that if this was not the person that did this to him . . . that he tell me that it wasn't the person, because it was just as important to let an innocent person go as it was to find the right person who committed the crime.

Escamillo did this "to make sure he didn't wrongfully accuse somebody of a crime." He testified after they arrived at the Waffle House, he told the victim to take "a good look and take his time." The victim told Escamillo that Miller "was definitely the person who tried to rob him." Escamillo testified that the victim "said he was absolutely positive."

R. E. Smith, the detective on the scene, testified during the pretrial hearing that he interviewed the girlfriend, who described the suspect as being a "relatively young" black male, with a "hairstyle that she referred to as corn-rows." He transported the girlfriend to the showup. Upon a signal given by Smith, Miller stepped out of a patrol car, and the girlfriend "looked and immediately said that's him." Smith testified that the girlfriend "made it a point to indicate to me that he was not wearing the same clothing that she had seen him in, but that was definitely the man." She did not hesitate "at all" in making the identification. Smith similarly testified at trial that the girlfriend stated at the showup that the man whom she observed at the Waffle House "was definitely" the man she had seen point a gun at the victim.

Of course, "[a] one-on-one showup is inherently suggestive. [Cit.]" *Salazar v. State*, 245 Ga. App. 878, 879 (1) (539 SE2d 231) (2000). But this does not mean that an identification made during a showup is necessarily inadmissible. "[B]oth state and federal courts have recognized countervailing considerations that can render one-on-one confrontations permissible, and even helpful," id., as such confrontations may "enhance accuracy and reliability, which expedite the release of innocent subjects. [Cit.]" Id. In deciding whether a showup must be excluded, a court must determine first whether the procedure used by the police "was impermissibly suggestive. If so, the court must then decide whether, given the totality of circumstances, there was a substantial likelihood of misidentification. [Cit.]" *Holbrook v. State*, 209 Ga. App. 301, 302 (1) (433 SE2d 616) (1993). "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, and the level of certainty demonstrated by the witness at the confrontation." (Citations and punctuation omitted.) *Flores v. State*, 228 Ga. App. 152, 153 (491 SE2d 86) (1997).

Miller cites *Banks v. State*, 216 Ga. App. 326 (454 SE2d 784) (1995). In that case, the victim could not see well and did not pay much attention to the defendant. Id. at 329. Here, though, the victim viewed Miller as he approached him and as he pointed a gun at him, and the girlfriend observed Miller for five to ten minutes before he fled the scene. As argued by the State on appeal, "both witnesses' level of attention was heightened" when Miller pointed the gun at the victim. Both the victim and the girlfriend gave descriptions that generally matched Miller's appearance, with the exception of his clothing. Evidence was presented, however, that clothing matching those descriptions was found in the woods from which Miller ran. Before the showups, police officers informed the witnesses that they should not accuse the person they would observe unless they were certain that he was the perpetrator. The showups occurred in a well-lit location in the vicinity of the incident approximately 45 minutes after the incident. And most importantly, in contrast to the victim's hesitant identification of the defendant in *Sims v. State*, 244 Ga. App. 823, 827 (537 SE2d 133) (2000), also cited by Miller, the victim and his girlfriend here immediately and unwaveringly identified Miller as the gunman less than an hour after the attempted robbery. The witnesses' "description of [Miller] to the police was substantially correct, and [their] identification of [Miller] within an hour of the incident was positive." *Flores v. State*, supra, 228 Ga. App. at 153. Under the totality of the circumstances, we conclude that the

trial court did not err in denying Miller's motion to exclude the identification testimony.

Miller argues that the showups were impermissibly suggestive because "the victims were told to come identify the person that robbed them, saw the defendant in handcuffs, and the defendant was alone in police custody." He points to the girlfriend's testimony that the detective "asked me could I go and identify . . . the person that supposed to have robbed [the victim]. And I told him yes." She later clarified this statement, however, when she testified that the detective asked her if she could "come down and identify the person that was at the Waffle House, that I had described" because he had a person there that "might fit that description." It is true that the victim testified that the police "asked me to give a positive identification of the guy" who attempted to rob him. Like that of his girlfriend, however, the victim's testimony was equivocal on this issue, for he later testified that the police asked if Miller looked like the person who robbed him. Although the testimony of the victim and the girlfriend was somewhat inconsistent concerning the statements made by the police to them with regard to the showup, the trial court was authorized to resolve conflicts in the evidence. See *Arnold v. State*, 155 Ga. App. 569-570 (271 SE2d 702) (1980). Furthermore, contrary to Miller's contention, neither eyewitness's testimony conclusively shows that the police actually told them that they had "the person that robbed them."

Miller argues that he was handcuffed and in police custody. Although Miller was not free to leave, as officers stood beside him holding his arms, the evidence at trial was in conflict as to whether he was handcuffed. On one hand, the victim apparently believed Miller was handcuffed, because Miller's hands were behind his back, and the girlfriend testified that Miller was handcuffed at the time of the showup. On the other, Hudson, Smith, and Escamillo testified that Miller was not handcuffed during the showup. But even if Miller was handcuffed and was surrounded by police at the time of the showup, these facts do not *require* exclusion of the identification testimony, for even if these facts rendered the showup impermissibly suggestive, as discussed above, evidence of the pretrial identification is inadmissible only if "under the totality of the circumstances, there was a substantial likelihood of irreparable misidentification. [Cit.]" *Barber v. State*, 236 Ga. App. 294, 296 (1) (512 SE2d 48) (1999). In light of the admonitions given to the eyewitnesses, their opportunity to observe Miller during the crime, their accurate description to the police, their unhesitating identification of Miller during the showup, the proximity of the apartment complex and the Waffle House, Miller's nervous

demeanor, and Miller's physical appearance at the time of the showup, we cannot conclude that a substantial likelihood of misidentification occurred.

2. In Miller's remaining enumerations, he contends that the trial court erred in refusing to continue the pretrial hearing on his motion in limine. The victim and his girlfriend apparently were subpoenaed for the hearing, but they failed to attend. Miller sought a continuance in order to procure their testimony. He argued below that the testimony of these witnesses would demonstrate that the conditions at the showup "have not been condoned and are actually suspect." Defense counsel made a proffer of the witness's testimony, and the trial court denied the motion for continuance and proceeded with the hearing.

The proffer made by defense counsel was similar to the trial testimony of these witnesses who testified that Miller was in handcuffs, while the law enforcement personnel testified that he was not. The witnesses' trial testimony did not conclusively show that the police officers told them before the showup that the actual suspect was in custody. But even to the extent that their trial testimony showed that a police officer might have made an improper comment concerning the subject of the showup, the officers' testimony contradicted this. The trial judge was authorized to resolve conflicting evidence in favor of the police officers' testimony. See *Arnold*, supra, 155 Ga. App. at 569-570.

The grant or denial of a continuance is in the sound discretion of the trial judge. *Johnson v. State*, 275 Ga. 650, 652 (5) (571 SE2d 782) (2002). To secure a continuance based on the absence of a witness, a defendant must meet several requirements, one of which is a showing that the witness's testimony is material. OCGA § 17-8-25. Given the eyewitnesses' trial testimony, which did not require a conclusion that the showup occurred during conditions causing a substantial likelihood of misidentification, we cannot conclude that the testimony of the victim and his girlfriend was material for the purposes of the pretrial hearing. We find no abuse of the trial court's discretion in denying the motion for continuance.

*Judgment affirmed. Ruffin, P. J., and Miller, J., concur.*

DECIDED MARCH 18, 2004.

*Derek M. Wright*, for appellant.
*Patrick H. Head, District Attorney, Amy H. McChesney, Jesse D. Evans, Assistant District Attorneys*, for appellee.