**FOURTH DIVISION**
**DOYLE, P. J.,**
**BROWN and COOMER, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**May 23, 2019**

# In the Court of Appeals of Georgia

A19A0504. WHITE v. THE STATE.

BROWN, Judge.

Reginald White appeals from his convictions of burglary in the first degree and possession of tools for the commission of a crime. He contends that the trial court erred by denying his motion to suppress based upon an impermissibly suggestive show-up identification and failing to make a proper inquiry into his request to represent himself under *Faretta v. California*, 422 U. S. 806 (95 SCt 2525, 45 LE2d 562) (1975). For the reasons explained below, we affirm.

The record shows that an eyewitness to the burglary testified in a motion to suppress hearing, as well as at trial. In the motion to suppress hearing, the witness, who had lived in the same gated condominium community as the burglary victim for three years, testified that when he heard a car door slam, he looked outside his upper

story window and saw a man getting out of the driver's side of a bright red Monte Carlo. This car was "not normally there" and it did not have a regular license plate. Instead, it had something "like maybe from a used car dealer . . . it was white, and it was yellow and there was some writing on it." The witness found it unusual because it was the middle of the day when the parking lot was usually empty, and he had never seen that car before. He saw a person come up the steps to his building, assumed the person was visiting his neighbor, and then heard some unusual noises.

About ten minutes later, he saw another man get out of the passenger side of the red Monte Carlo and approach another door in a different unit. He watched "for a while" and thought that man is "going to feel really stupid in a few minutes when he realizes that he's gone to the wrong door." After walking away from the window to do something else, the witness heard "more loud noise," looked out the window again, and saw the passenger walking back across the street with a flat screen television. He watched the man place it in the back seat of the car. He did not immediately call 911 because walking with a television does not necessarily mean it was being stolen.

The witness explained that the Monte Carlo was located approximately 40 to 50 feet away from him during the burglary, that it took place around 10:00 to 10:30

in the morning, that the weather was dry and "sunshiny," and that nothing obstructed

his view from the window to the street.[1] He saw the driver coming up the stairs "very

briefly" for about 10-15 seconds. With regard to the passenger he testified,

> I saw him when he got out of his car and went into the unit downstairs
> and I saw him leaving with the TV. So I'm thinking he would have been
> facing me when he came towards the building, so that's probably about
> another maybe 15, 20 seconds probably at the most there, and then I saw
> him when he left and which basically I saw the back of him there. But
> when he turned to get into the car I was able to see his face again. . . .
> Now, I'm a distance away, so I'm not going to – able to say, well, he has
> a scar under his left eye or anything like that, but, you know, I can see
> the gentlem[a]n's basic proportions and notice what he had on and his
> hair.

He described the passenger carrying the television as having braids in his hair and

being heavier than the smaller, more slender driver.[2] The driver might have also had

braids in his hair. With regard to the description he provided to the 911 operator, the

---

[1] At trial, the witness explained that he looked out the window by raising an individual slat of the blinds on his window.

[2] A police officer, who later completed information in an arrest warrant about the passenger (White) and the driver (Romell Middlebrooks) from driver's license records, listed White's height and weight as 5'7" and 150 pounds and Middlebrooks' height and weight as 5'9" and 185 pounds.

3

witness recalled mentioning braids in the hair, but "didn't give [the operator] everything. She really didn't ask for everything because there were two guys."

After talking with a friend who had noticed something strange about the burglary victim's door that morning, the witness went downstairs and saw that the victim's door jam was broken and the "door was a bit ajar." He then called 911 and gave a description of what he had seen to the operator. He "basically told them . . . that [he] saw . . . a burglary that had just taken place. [H]e described the car and [he] gave a little bit of information about the two individuals and explained that what [he] saw them take was the TV." As he talked with another neighbor about what had happened, he received a call back from the police stating "they believe that they found the car that I described" and asked if he could "go be a witness or to identify to see whether or not they're the same people that I saw."[3] A police officer picked

---

[3] At trial the witness testified somewhat differently on direct examination, stating that he received a call "indicating that they had stopped the car and *the individuals* and they wanted to know whether [he] would be willing to make an identification." (Emphasis supplied.) Through additional testimony, he explained that the officer who drove him to the identification never told him "anything about who these people are" or that he needed to "pick these people out or something of that nature." The police officer who drove the witness denied any suggestive statements and testified that he told the witness "we had some guys detained and we wanted him to take a look at them to verify whether or not those were the people that he saw committing the crime."

him up and drove him to a location approximately five minutes away. The witness testified that when he arrived at the location

> I saw the car – obviously I can see that before I could see the person; that's much larger, which I recognized immediately after confirming the vehicle plates. And there were two gentleman in front of it and some other gentlemen around the back. I know there were two gentlemen in front of it.
>
> And initially I could recognize from their clothing at that time that those were the guys that I saw, but I couldn't really see them. And I explained that to the officer that I couldn't really see them, so he drove closer so that I could really get a good look at them.

After getting a closer look from about 15-20 feet away, the witness identified them as "the same two guys that I saw less than an hour [ago], pretty much before that, coming out of that unit." The men were "[w]earing the very same clothes that [h]e just saw them wearing." The witness explained that because the two men were standing in front of the car facing him, he did not see any handcuffs and "had no way of knowing whether they were cuffed or where their hands were," but he "would assume that they were handcuffed." At the time of this identification, the witness "was 100 percent certain" these were the same men he had just seen. In an audio

5

recording of the show-up identification, the witness stated, "Yes, that is them. I specifically remember the guy with the braids."

By the time of the motion to suppress hearing, the witness expressed some uncertainty about being able to identify White in court, explaining that "it's sort of not a fair question. . . . [I]t's been some time since the incident. And at the time that I saw him initially, I wasn't thinking that I would need to remember every nitty gritty detail about him." The witness also stated that he could not really answer as to what the two men were wearing because there was nothing distinctive about it and too much time had passed. The witness nonetheless testified that "to the best of [his] remembrance, [he saw] that individual here today."

During the trial, the witness testified during direct examination with regard to the show-up that

> [t]hey were the guys I recognized in totality. It wasn't any one specific thing, really. It's seeing two guys, same proportions. I had just seen them so at that time I knew exactly what they were wearing. In other words, if someone were to ask you all an hour from now what I was wearing, you probably could give them a pretty good description, but if they ask you two weeks from now what I was wearing, you probably wouldn't remember. . . . I didn't pay that close attention. I wasn't expecting to have to write a fashion column regarding what they were wearing.

During cross-examination, the witness repeated that there was "nothing distinctive to remember about what they were wearing," explaining that they were not wearing jackets or a suit, and with regard to color, he stated he "would probably say maybe a very light whitish t-shirt[]," but he was not certain. When pressed further about the body type of both men, the witness stated the passenger was heavier than the driver and that they both had on "loose fitting clothing." When questioned about previously stating both of the men had braids, the witness testified, "I mean, it was unclear. Now, I know the one that I – the gentleman over there. I recognize him. The look that he's giving me right now, the eyes, something about that. That is the gentleman. Whether he has on clothes or not. He can't change his eyes. He can change his hair, but he can't change his eye."

The State presented evidence from the 911 call center showing that the witness called at 10:25 a.m. and stated that he thought "someone . . . has just broken into the unit below me" and drove away with a flat screen television in a red Monte Carlo with temporary plates about five minutes before. He reported that "it [was] two black guys and one had braids or something like that." When the operator asked what they were wearing, the witness stated that he did not know. A patrol officer testified that he received a BOLO "that there was a burglar[y] in progress and gave a description

7

of . . . the red vehicle with a yellow drive[-]out tag." Immediately afterward, he saw a car matching the description traveling in the opposite direction. After confirming the drive-out tag, he initiated a traffic stop around 10:36 a.m., and detained White and Romell Middlebrooks. The officer testified that he believed both men had cornrows in their hair, and another officer testified unequivocally that White had cornrows or braids in his hair and described him as heavier than Middlebrooks. Around 10:49 a.m., the eyewitness identified the car and the two men. The traffic stop occurred approximately a mile and a half away from the burglary location.

The victim testified that her television, a briefcase, an iPad, and two containers containing cash were missing from her home after the burglary. The police recovered all of her missing property from the red Monte Carlo other than the cash. The majority of the victim's items were located in the back seat and the television was in the trunk.

1. White argues that the trial court erred by denying his motion to suppress the eyewitness's show-up identification. As White recognizes in his brief, "[a]lthough a one-on-one show-up is inherently suggestive, identification testimony produced from the show-up is not necessarily inadmissible." (Citation and punctuation omitted.) *Butler v. State*, 290 Ga. 412, 414 (3) (721 SE2d 876) (2012). Instead, it "is

8

inadmissible only if under the totality of the circumstances, there was a substantial likelihood of irreparable misidentification." (Citation and punctuation omitted.) Id. at 415 (3).

> The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, and the level of certainty demonstrated by the witness at the confrontation.

(Citation and punctuation omitted.) *Miller v. State*, 266 Ga. App. 378, 382 (1) (597 SE2d 475) (2004).

In this case, the red Monte Carlo in which White was riding was stopped approximately one and a half miles away from the burglary location within 11 minutes of the 911 call. The witness identified White and Middlebrooks with 100 percent certainty less than an hour after the burglary, and items taken from the victim's home were found in the car. Even with some of the inconsistencies in the witness' testimony, including with regard to what the police told him before the show-up, the totality of the circumstances in this case authorized the trial court to find that no substantial likelihood of irreparable misidentification existed. See *Freeman v. State*, 306 Ga. App. 783, 785 (2) (703 SE2d 368) (2010) (trial court properly

9

denied motion to suppress show-up identification in case where victim identified the defendant less than 30 minutes after the incident occurred and expressed a high degree of certainty); *Lee v. State*, 298 Ga. App. 630, 631-632 (1) (680 SE2d 643) (2009) (trial court did not err by denying motion to suppress show-up identification of defendant inside a distinctive car driven from the scene of a shooting); *Miller*, 266 Ga. App. at 382-383 (1) (affirming trial court's denial of motion to exclude show-up identification testimony even though eyewitness testified that at one point the police asked her to identify *the person* that robbed the victim; witness's statement did not conclusively show that police told her that they had the person who had committed the robbery); *Mitchell v. State*, 242 Ga. App. 177, 179 (2) (529 SE2d 169) (2000) (finding no substantial likelihood of irreparable misidentification where defendant arrested within an hour and in the immediate neighborhood of robbery while carrying proceeds from the robbery and witness stated "his face was very fresh in her mind" at the time she identified him in show-up) (punctuation omitted). Accordingly, the trial court did not err in denying White's motion to suppress.

2. In his remaining enumeration of error, White contends that he is entitled to a new trial because the trial court failed to have a hearing required by *Faretta*, supra, after his counsel made a request for self-representation on his behalf. We disagree.

10

Both the federal and state constitutions guarantee a criminal defendant the right to self-representation. An unequivocal assertion of the right to represent oneself, made prior to trial, should be followed by a hearing to ensure that the defendant knowingly and intelligently waives the right to counsel and understands the disadvantages of self-representation.

(Citations and punctuation omitted.) *Owens v. State*, 298 Ga. 813, 814 (2) (783 SE2d 611) (2016). On the other hand, "[i]f the assertion of the right to proceed without the benefit of counsel is equivocal, there is no reversible error in requiring the defendant to proceed with counsel." *Wiggins v. State*, 298 Ga. 366, 368 (2) (782 SE2d 31) (2016). When making a *Faretta* inquiry, "[t]he trial judge is not required to use any particular language in making the defendant aware of his right to counsel and the dangers of self-representation." *Martin-Argaw v. State*, 343 Ga. App. 864, 867 (2) (806 SE2d 247) (2017).

In this case, the record shows White was represented by a public defender and changed his mind about pleading guilty when he learned during the plea hearing that the trial court would not be willing to refer him to drug court and that his sentence would require him to serve five years in prison. In a subsequent hearing on White's motion to suppress eyewitness identification testimony, the issue of White

11

representing himself arose during the State's direct examination of a police officer involved in the show-up identification by the witness. When the State asked the officer about an audio recording of the identification, the trial court interjected to assert that there would be no need to play it as there was no issue about whether the witness had made an identification. When the State agreed to "move on" with its questioning, White's public defender asked the court to "hold on one moment" and stated, "[m]y client would like to represent himself and handle the rest of the motion." The following exchange then took place between the trial court and White:

> THE COURT: Well, Mr. White, you can represent yourself, but you have to fire your lawyer and I have to qualify you to represent yourself. And you don't get to pick and choose. You can't handle half of a motion and then have her come back in and represent you for the trial.
>
> [WHITE]: Your Honor –
>
> THE COURT: She's doing a pretty good job so far. What's your complaint? I mean, I'm sorry if it's not going well, but it's not her fault.
>
> [WHITE]: No; what I want to ask your honor, it's things she's not objecting to I think she should. It's questions she's not asking that I think she should.
>
> THE COURT: Well, it's not her turn yet. I mean, she hasn't – it's not her turn –
>
> [WHITE]: No, I'm talking about the witness.
>
> THE COURT: That last witness?

[WHITE]: Yeah, for real because he just said some things that I know not possible to be true. And she's not – to me she's not putting emphasis on nothing, because, like, if you're going to give a description of a person, I feel personally, he gave no description of what he was looking for because I'm not who he's saying.

THE COURT: Well, she's made that point and then she's going to argue that to me later. I know what her argument's going to be, that he didn't give a description of your clothes; how does he remember what you're wearing. I mean, she's made the point.

[WHITE]: Yes, ma'am.

THE COURT: I mean, she doesn't have to hit me over the head with a hammer for me to get it.

[WHITE]: You're right.

THE COURT: So she's a really good lawyer. You know, if she's not up here screaming at me with these points, in my opinion that's a good thing. Because if she did, I would be getting really irritated.

[WHITE]: Yes, ma'am.

THE COURT: So she's looking after your interest. And I assure you that I don't know of anybody who would do a better job, and it definitely won't be you. No offense.

[WHITE]: I understand. I can respect that.

THE COURT: Can we continue on?

[WHITE]: Yes, ma'am.

THE COURT: Okay.

[DEFENSE COUNSEL]: Thank you.

From the above, we conclude that the trial court began a hearing into White's request to represent himself and that "[d]uring the course of the hearing, it became clear that [White]'s request to represent himself was not unequivocal." *Pruitt v. State*, 279 Ga. 140, 142 (2) (611 SE2d 47) (2005). Indeed, the only reasonable conclusion to be drawn from the trial court's interaction with White is that he changed his mind and agreed to continue with his current counsel. See *Herrington v. State*, 332 Ga. App. 828, 830 (1) (775 SE2d 195) (2015). Accordingly, the trial court did not deny White his right to represent himself, and the additional inquiry required by a *Faretta* hearing was unnecessary. *Potts v. State*, 259 Ga. 96, 105 (28) (376 SE2d 851) (1989). See also *Colwell v. State*, 273 Ga. 634, 637-639 (3) (b) (544 SE2d 120) (2001). The trial court's exchange with White and its query as to whether the case could "continue on" distinguishes this case from those in which the trial court *summarily* denied a defendant's request for self-representation.

Our opinion in *Bettis v. State*, 328 Ga. App. 167 (761 SE2d 570) (2014), relied upon by White on appeal, is distinguishable. In that case, the trial court denied the defendant's request immediately, the record contains no colloquy between the trial court and the defendant like the one that transpired in this case, and the defendant was never asked if he wanted to continue with trial counsel. Id. at 168-171. Likewise, in

14

*Smith v. State*, 332 Ga. App. 849 (775 SE2d 211) (2015), we granted the defendant a new trial based upon the trial court's decision to "summarily" deny a defendant's request to represent himself based upon its conclusion "that the request was a dilatory tactic." Id. at 853-854 (2). Finally, this is not a case in which the trial court assumed from silence at the beginning of the trial that the defendant no longer wished to represent himself. Compare *Wiggins*, 298 Ga. at 367-368 (2) (trial court ignored defendant's written requests to represent himself and denied motion for new trial based upon defendant's failure to renew his request at the start of the trial).

*Judgment affirmed. Doyle, P. J., and Coomer, J., concur.*